UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-239 (SRN/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | GOVERNMENT'S POSITION |
| v. ) | WITH RESPECT TO SENTENCING |
| ) | |
| ARON AVRAM SHAMILOV, ) | |
| ) | |
| Defendant. ) | |

The United States of America, by and through its attorneys Gregory G. Brooker, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Charles J. Kovats, Jr. and Timothy C. Rank, hereby submits its position with respect to the sentencing of Aron Avram Shamilov ("the defendant").

## I. THE CASE AGAINST THE DEFENDANT

### A. The Charge of Conviction

On November 13, 2017, the defendant pleaded guilty to impersonation of a federal officer, in violation of Title 18 U.S.C. § 912. This offense carries a statutory maximum sentence of three years' imprisonment, a one-year term of supervised release, a $250,000 fine, and a $100 special assessment.

### B. The Defendant's Offense and Relevant Conduct

#### 1. The Factual Basis in the Plea Agreement

As agreed to by the parties in the plea agreement:

On or about March 29, 2017, in the District of Minnesota, the defendant provided to an apartment leasing office a letter purportedly authored by a Special Agent of the FBI in support of the defendant's attempt

to obtain a residential lease. The letter provided by the defendant falsely states that he was a victim of identity theft (See "Letter" at Annex 1 to this agreement), which was intended to support the defendant's false claim to the leasing office that his low credit score could be explained by the fact that someone had stolen his identity.

The defendant fabricated the letter on or about March 9, 2017. The letter bears the FBI seal, purports to have been authored by "Special Agent Richard Thornton" of the Minneapolis Division of the FBI, and falsely states that Special Agent Richard Thornton has been assigned to investigate an identity theft case in which the defendant was a victim.

At the time the defendant presented this letter to the leasing office, he knew the letter was false in all material respects. He also admits that he submitted the letter to obtain by fraud a thing of value, namely, a residence that he could not otherwise obtain because of his poor credit history.

### 2. *Additional Facts Described in the PSR*

As described below, the PSR provides additional information about the offense conduct (PSR ¶¶ 6-13); describes the defendant's misconduct that resulted in revocation of his pretrial release (PSR ¶¶ 3, 15); and notes other relevant conduct, including the defendant's production of additional fraudulent letters purportedly authored by law enforcement officials (PSR ¶¶ 12-13).

The government believes the PSR provides a sufficient record of the defendant, his background, and his conduct. Accordingly, government does not believe an evidentiary hearing at the time of sentencing is necessary.

### 3. *The Pertinent Guideline Calculations Agreed to by the Parties*

In the plea agreement, the parties agreed to the following Guideline calculations:

Base Offense Level, § 2J1.4:			6	(Plea Agreement, para. 6(a))

Acceptance of Responsibility, § 3E1.1(a):	-2	(*Id*. para. 6(c))

Total Offense Level:                                   4       (Id. para. 6(e))

The parties also agreed that no specific offense characteristics or Chapter 3 adjustments other than the two-level downward adjustment for acceptance of responsibility should apply.  (*Id*. paras. 6(b) and (c)).  The parties also agreed that the defendant's criminal history category would likely be III.  (*Id*. para. 6(d) and (e)).

## II.     THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about January 16, 2018, the United States Probation Office disclosed the PSR in this case. The PSR calculates the defendant's applicable guideline range at 0-6 months' imprisonment, based on a total offense level of 4, criminal history category III, and a statutory maximum sentence of 3 years' imprisonment.  (PSR ¶¶ 96, 97).  The PSR also sets forth the statutory maximum periods of supervised release (1 year) and probation (5 years).  (PSR ¶¶ 100, 102).

The government has no objections to the PSR and agrees with the factual summary contained therein.  The government also agrees with the guideline calculations contained in the PSR and notes that they align with the calculations agreed to by the parties in the plea agreement.

## III.    THE GOVERNMENT'S ANALYSIS UNDER 18 U.S.C. § 3553(a).

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to

determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense.

As described in the plea agreement and PSR, the defendant provided to an apartment leasing office a letter purportedly authored by a Special Agent of the FBI in support of the defendant's attempt to obtain a residential lease. The manager of the apartment complex suspected something was afoot and called the FBI. Shortly thereafter, the defendant was identified, located, and arrested. The defendant did not acquire the lease he sought and

the victim suffered no financial loss. (PSR ¶ 14). The defendant pleaded guilty in short order. (PSR ¶ 2). The present conviction is the defendant's first felony conviction and the Guidelines range for this offense is 0-6 months' imprisonment. (PSR ¶ 97). In a typical case, these facts likely would result in the imposition of non-custodial sentence. However, there is nothing typical about this defendant, his history of deceit, or his apparently dim prospects for a law-abiding future. Consequently, the government cannot recommend a non-custodial sentence in this case.

B. **History and Characteristics of Defendant.**

The defendant was born in Los Angeles in 1993 and is 24 years old. (PSR ¶ 59). The PSR indicates the defendant endured a difficult and, at times, abusive upbringing. (PSR ¶¶ 60-64).[1] The adults responsible for his upbringing apparently victimized the defendant and society; indeed, nearly all the adults in his life have criminal history. (PSR ¶¶ 63-65). Without a stable and supporting family life, the defendant proved unable to succeed at school or in the workplace. (PSR ¶¶ 64, 67, 71-72 (school history) and PSR ¶¶ 76-92 (employment history)).

Nearly every defendant released from prison will be influenced by these same factors: (1) family and other close associates; (2) level of education and degree of

---

[1] The PSR describes a pattern of abuse inflicted upon the defendant by several of his caregivers. This history is largely self-reported by the defendant. The government notes that despite the best efforts of the United States Probation Officer, much of this information has not been corroborated. The government readily concedes, however, that corroborating incidents of domestic abuse can be difficult, if not impossible, to achieve in many instances. With that said, it may be appropriate to consider both the defendant's history of duplicity with the Court and the unsuccessful attempts by the Probation Officer to locate corroborating records where they should exist (i.e., PSR ¶¶ 64, 72) before accepting as fact what is reported by this defendant.

5

motivation for further self-improvement; and (3) the capacity to gain and hold employment. At sentencing, the Court regularly imposes conditions of supervised release that are based on a consideration of these same factors, often including conditions that aim to control with whom a defendant associates, or requiring a defendant to gain and maintain employment or further his education. The government anticipates the Court will endeavor to do the same here (and the government certainly would recommend doing so). Unfortunately, the record suggests these "influencers" will not assist this defendant upon his eventual release from custody, in part, because the defendant sees them as targets to be exploited, rather than as helpful resources. Considering the following:

*The Defendant's Family and Close Associates*

As described above, although the defendant was certainly victimized by his family, he victimized them in return – stealing between $20,000 and $40,000. (PSR ¶ 64). Likewise, the government is aware the defendant falsely advised his girlfriend, E. V., that he maintained employment at a local restaurant when he did not. He has also lied to his Court-appointed probation officer who endeavored to assist him with employment and other beneficial resources.

*The Defendant's History in Education*

The defendant attended St. Louis Park Junior High and High School and inflicted sexual abuse upon three of his classmates. (PSR ¶ 71). Worse, after inflicting his abuse, he "continued remarking about the incidents to other students." (*Id*). According to the PSR, the defendant had "numerous disciplinary issues" in addition to the sexual

6

misconduct. (*Id*). The defendant "stole items and money from staff; harassed other students; used racial slurs at other students; [and] continually engaged in fights with other students," among other misconduct. (*Id*).

Additionally, the defendant reported to the Probation Officer that he attended Normandale Community College ("NCC") in Bloomington, Minnesota, from 2012 – 2014, following his graduation from high school. (PSR ¶ 72). It appears this is also a lie because there is no evidence that the defendant actually attended NCC. (*Id*). Indeed, the PSR notes "[s]taff at Normandale Community College reported no transcript for the defendant at their institution" nor was the defendant's mother able to "provide any educational documents or tuition bills to support the defendant's enrollment at Normandale." (*Id*).

*The Defendant's Employment History*

The defendant's employment history provides the clearest evidence of the defendant's apparent compulsion to lie, cheat, and steal. (PSR ¶ 77-91). By the government's count, the defendant was terminated from at least ***10 different employers*** – nearly all restaurants – during a period from 2013 through 2017. (PSR ¶¶ 77, 78, 79, 80, 84, 85, 86, 87, 89, 90).

The defendant was fired from Noodles and Company in 2013 when he "collected his paycheck from the safe, cashed it, and reported to his superior that he had not been paid . . . a new paycheck was drafted." (PSR ¶ 90). Also in 2013, the defendant was fired from Express after he "stole $600 in cash and a watch valued at $248." (PSR ¶ 89). That

7

the defendant earned only $248 in wages at Express before he was terminated is a remarkable statement about his true intentions "at work." (*Id*). Next, the defendant was fired from Panchero after "stealing cash from the register." (PSR ¶ 87). The defendant earned $492 in wages at Panchero – which suggests that, like at Express, his theft likely occurred within his first week on the job. (*Id*).

In 2014, the defendant continued apace: he was terminated from both Domino's Pizza and Papa John's Pizza for stealing from his employers. (PSR ¶¶ 84, 85). In 2015, the defendant found and quickly lost employment at five restaurants. (PSR ¶¶ 79-83). Although records could not be located for three of them, the defendant was terminated from the other two (LeeAnn Chin: for stealing, and Spasso: for falsifying payroll documents). (PSR ¶¶ 79-80). As to the other three restaurants? The defendant failed to report these employers to the Probation Officer but the PSR shows the defendant earned a mere $134 from PCJ, $257 from Potbelly Sandwich, and approximately $2,600 from Middle A Restaurants (Which Wich). (PSR ¶¶ 81-83). Finally, in 2016, the defendant was fired from both District Fresh and Mort's Delicatessen for similar misconduct. (PSR ¶ 77-78). Apparently, none of the restaurant-related thefts resulted in a criminal charge or conviction. (PSR).[2]

The defendant's employment history demonstrates a few things: (1) a propensity to steal from his employer when provided any opportunity to do so; (2) an absolute lack of

---

[2] The defendant did suffer a conviction for his role in an identity theft-type scheme relating to his work as an independent contractor from Seacret Spa Products. (PSR ¶ 86).

remorse for his behavior; and, most dangerous here, (3) an apparent impulsive desire to prey upon his employer.

The Court now must fashion a sentence that takes into account the history and characteristics of this defendant, including his history of exploiting those close to him, those who might educate him, and those who might employ him. This is a difficult task indeed.

    **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The instant offense, the defendant's criminal history, and his conduct on pretrial release, clearly demonstrate the low regard he has for the law. First, the instant offense – fraudulently representing himself as an FBI Agent – shows a remarkable level of audaciousness and disrespect for the law. It is also evidence of his willingness to exploit the public's trust in law enforcement for his own financial gain. After all, reasonable people do not dare to pretend they are agents of the FBI or the Golden Valley Chief of Police.

Although the present case represents the first felony offense for which the defendant has been convicted, his criminal history is noteworthy nonetheless. The defendant has been convicted for fraud offenses on several occasions. (PSR ¶¶ 31, 41, 42, 49). Relatedly, he has more than 10 driving related convictions (none of which affects his Guidelines Criminal History Category). During the pendency of these previous criminal

matters, the defendant failed to appear in court approximately 19 times – additional compelling evidence of the defendant's disdain for the rule of law.

In case one might have harbored a belief that the defendant's recent arrest by the FBI, subsequent indictment, and appearance before a federal judge, might have germinated in the defendant a newly found respect for the law, the defendant's conduct on pretrial release has eliminated this possibility. The defendant, after having spent a night in custody, won his release and promptly executed a campaign of deceit upon his supervising Probation Officer. Rather than leverage this Court-appointed asset for his own betterment, he sought to evade and deceive her by representing that he was gainfully employed when he was not. When questioned by his Probation Officer, he committed the exact same fraudulent conduct that brought him to Court in the first place: he drafted a phony letter hoping to avoid responsibility for his actions. This is truly audacious misconduct.

> **D. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public.**

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. By his conduct, the defendant has demonstrated that he will not likely be deterred. Indeed, based on his track record, it reasonable to expect he will continue to commit fraud – perhaps even in an escalating fashion. In this case, the government submits that the best the Court can do is to incapacitate this defendant, at least temporarily, through confinement followed by a term of supervision.

General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). In light of the defendant's actions and his clear disrespect for the law and the Court, a custodial sentence beyond "time served" would at least communicate that the defendant's crimes and other violations will not be tolerated.

### E. The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.

The Guideline sentencing range for the offense to which the defendant pleaded guilty is 0-6 months' imprisonment. The defendant will have served approximately four months' imprisonment by the time the Court will pronounce his sentence. In the government's view, four months' imprisonment is not long enough for Mr. Shamilov and certainly would fail to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: February 2, 2018
Respectfully Submitted,

GREGORY G. BROOKER
United States Attorney

s/ Charles J. Kovats, Jr.
_____
CHARLES J. KOVATS, JR.
TIMOTHY C. RANK
Assistant United States Attorneys